IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MISHAN BRADFORD,<br><br>Defendant. | No. CR08-0030<br><br>REPORT AND RECOMMENDATION |

## TABLE OF CONTENTS

*I.*   *INTRODUCTION.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*II.*   *PROCEDURAL BACKGROUND.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*III.*   *ISSUE PRESENTED.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*IV.*   *RELEVANT FACTS.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*V.*   *DISCUSSION.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    *A.*   *Warrantless Search of the Garage.* . . . . . . . . . . . . . . . . . . . . . . . 5
        *1.*   *Public Safety Exception.* . . . . . . . . . . . . . . . . . . . . . . . . . 6
        *2.*   *Destruction of Evidence Exception.* . . . . . . . . . . . . . . . . . 9
    *B.*   *Consent Search of the House.* . . . . . . . . . . . . . . . . . . . . . . . . . 11
    *C.*   *Defendant's Statements to the Police.* . . . . . . . . . . . . . . . . . . . 12

*VI.*   *RECOMMENDATION.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

## I. INTRODUCTION

On the 5th day of August 2008, this matter came on for hearing on the Motion to Suppress (docket number 15) filed by the Defendant on July 22, 2008. The Government was represented by Special Assistant United States Attorney Mark A. Tremmel. Defendant Mishan Bradford appeared personally and was represented by his attorney, Jill M. Ableidinger.

## II. PROCEDURAL BACKGROUND

On June 10, 2008, Defendant Mishan Bradford was charged by Indictment (docket number 1) with possession of a firearm as an unlawful user of controlled substances. Defendant entered a plea of not guilty and trial was scheduled before Chief Judge Linda R. Reade during the two-week period beginning on September 2, 2008. On July 22, 2008, Defendant timely filed the instant Motion to Suppress.

On August 11, 2008, however, Defendant filed a Notice of Intent to Plead Guilty (docket number 20) and Notice of Conditional Guilty Plea and Reservation of Right to Appeal (docket number 21). Defendant indicates his intention to plead guilty, while reserving his right to appeal any adverse ruling on the instant Motion to Suppress. Pursuant to Defendant's notice, a plea change hearing has been scheduled on August 19, 2008.

## III. ISSUE PRESENTED

Defendant claims that the warrantless search of his residence and garage on April 10, 2007, violated the Fourth Amendment; and the fruits of that search, including statements made by Defendant, should be suppressed.

## IV. RELEVANT FACTS

At 2:10 a.m. on April 10, 2007, Sergeant John Phipps of the Cedar Rapids Police Department was dispatched, along with other officers, to the 1400 block of Hollywood Drive NE. It was reported that there was a "domestic disturbance" involving a couple arguing in the street. The person who called in the complaint was blind, however, and unable to provide more detailed information.

According to Sergeant Phipps, officers arrived on the scene within a few minutes. "All was quiet" when officers arrived and no one was seen in the street or nearby yards. Within a few minutes, however, officers received a second call from dispatch, reporting shots fired at 1410 Hollywood Drive NE. Apparently, the shot or shots were fired while the officers were en route to the scene, but the call reporting the shot was slightly delayed

2

and, therefore, the second call from dispatch was not received until after officers were on the scene.

As officers approached the residence at 1410 Hollywood Drive NE, Sergeant Phipps observed that the front window was broken and it appeared that shots had been fired into the residence. Sergeant Phipps spoke with the occupant, who reported that she heard a disturbance and then a gunshot. According to Sergeant Phipps, there were bullet holes which penetrated the livingroom wall and into the kitchen. Sergeant Phipps testified that he could not tell how many shots had been fired or from what type of gun. He opined that the damage could have been the result of several shots by a small caliber gun, or could have been caused by a shotgun.

The occupant at 1410 Hollywood Drive NE also told officers that the disturbance involved a female who lived across the street. It was reported that the female had left in a vehicle before the officers arrived.

The officers then proceeded to 1415 Hollywood Drive NE -- a single story residence with a detached garage, located directly across the street from 1410 Hollywood Drive NE. A sign on the front door directed visitors to use the back door. Officers proceeded to the back of the house, where Sergeant Phipps found the back door "ajar" and the lights on inside the house. Sergeant Phipps opined that he believed it was "unusual" for the door to be open at that time of night. Sergeant Phipps announced his presence as a police officer on several occasions and told anyone inside the house to come out. There was no response.

Given the report of a domestic disturbance and evidence of a shot or shots fired at the house across the street, Sergeant Phipps was concerned that there may be a shooter in the residence at 1415 Hollywood Drive NE. Sergeant Phipps also recognized the potential for a gunshot victim or hostage to be in the house. To promote the safety of officers, Sergeant Phipps called for a "special response team," which included an officer with a "ballistic shield." While waiting for the special response team, officers found an empty shotgun shell casing near the foundation of the residence.

3

Upon arrival of the special response team, officers went inside the house, but did not find anyone. They then entered the nearby garage through a side door. The door was closed, but unlocked. The initial search of the garage--which Sergeant Phipps described as a "fluid" search which took less than a minute--did not locate any persons or weapons. Some officers remained in the garage and a secondary--more thorough--search was conducted. An officer heard noises coming from under some garbage bags. (Sergeant Phipps described the garage as very cluttered.) Defendant Mishan Bradford was found hiding under the garbage bags. Defendant was then taken to a patrol car.

After Defendant was removed from the garage, officers continued the "secondary search" and found a shotgun in an overhead "attic area." According to Sergeant Phipps, the gun was "warm to the touch," it had "powder on the end of it," and it was "clear that it had been fired recently."

As Defendant was being taken to the patrol car, he told officers that someone else had fired the weapon and then left the scene. While still at the scene, Defendant was read his *Miranda* warnings and he said that he understood them. Defendant then told officers that there was an argument at the house and somebody he did not know shot the gun and then left. Defendant admitted living at the residence. Sergeant Phipps asked for Defendant's consent to search the house, and he agreed. A search of the house revealed a case for a long gun, a pellet gun, mail addressed to Defendant, and drug paraphernalia.

Defendant was then transported to the Cedar Rapids Police Department, where he was questioned by investigator Daniel Jabens. Investigator Jabens testified that he provided Defendant with a written *Miranda* warning, which Defendant then read to Investigator Jabens. Both Defendant and Investigator Jabens then signed the form.[1] Defendant told Investigator Jabens that he understood his rights. According to Investigator

---

[1] *See* Waiver of Rights of Person Being Detained for Questioning (Government's Exhibit 1).

4

Jabens, Defendant never asked for a lawyer, nor did he show any hesitation in answering questions.[2]

## V. DISCUSSION

Defendant argues that the warrantless search of his garage was not supported by probable cause and exigent circumstances, and, therefore, was violative of the Fourth Amendment. Defendant further argues that since his consent to search the house followed the "illegal" search of the garage, the results of that search must also be suppressed. Finally, Defendant argues that his statements should be suppressed "because they were a product of the illegal search of his garage."

### A. Warrantless Search of the Garage

This case raises familiar Fourth Amendment principles. The Fourth Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, protects persons "against unreasonable searches and seizures." The "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585 (1980) (quoting *United States v. United States District Court*, 407 U.S. 297, 313 (1972)). "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Id.* at 586 (citing *Coolidge v. New Hampshire*, 403 U.S. 443 (1971)). Defendant argues that the warrantless search of his garage violated the Fourth Amendment.[3]

---

[2] Apparently, Defendant was also questioned by Investigator Chip Joeckens on the following day, but the testimony regarding that subsequent interview was limited and imprecise.

[3] The Government in the instant action apparently concedes that Defendant's garage is part of his home's curtilage and, therefore, protected by the Fourth Amendment against unreasonable search and seizure. *See United States v. Dunn*, 480 U.S. 294, 300 (1987), and *Hester v. United States*, 265 U.S. 57 (1924). *But see, United States v. Gerard*, 362 F.3d 484, 487 (8th Cir. 2004) (holding that a defendant's garage lay outside the curtilage of his farmhouse).

5

It is well-established that a search within a home without a warrant is presumptively unreasonable. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006). The Government has the burden of overcoming the presumption of unreasonableness that attaches to all warrantless home entries. *Welsh v. Wisconsin*, 466 U.S. 740, 750 (1984). The Government can meet this burden by establishing exigent circumstances which "make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 393-394 (1978). For example, "[e]xigent circumstances are present where lives are threatened, a suspect's escape is eminent, or evidence is about to be destroyed." *United States v. Williams*, 521 F.3d 902, 908 (8th Cir. 2008). In this case, the Government argues that exigent circumstances existed (1) to protect the public safety, and (2) to prevent the destruction of evidence.

### 1. *Public Safety Exception*

The Government argues that a warrantless search was justified to protect public safety. "A legitimate concern for officer safety or the safety of others may constitute an exigent circumstance, and a warrantless entry into a residence may be justified if an officer has a reasonable fear of harm." *United States v. Poe*, 462 F.3d 997, 1000 (8th Cir. 2006); *United States v. Hill*, 430 F.3d 939, 941 (8th Cir. 2005) (same).

The Eighth Circuit Court of Appeals recently addressed facts similar to those presented here in *United States v. Valencia*, 499 F.3d 813 (8th Cir. 2007). There, police officers received a dispatch in the early morning hours, reporting that someone had fired multiple shotgun shells from an apartment building. Upon arriving at the scene, officers encountered the defendant, who matched the description of the suspected shooter. The defendant denied any knowledge of the reports of gunshots, but admitted that he lived in the apartment where the shots were reportedly fired. The defendant told officers that there was no one in the apartment. Officers then encountered the defendant's live-in girlfriend, who was uncooperative in answering questions about the incident, but told officers that no one was in the shared apartment.

After checking common areas inside and outside the apartment building, and failing to find any physical evidence, the officers "discussed the need to determine whether the shooter or any victims were still within apartment five." *Id.* at 815. The officers decided to enter the apartment and, after spending roughly ten minutes in an unsuccessful attempt to pick the lock, they kicked in the door to gain entry. The officers entered the apartment 33 minutes after receiving the initial dispatch regarding the gunshots. *Id.* The officers "made a two-minute protective sweep of the apartment, finding no victims but noticing shotgun shells and casings on the floor." *Id.* The officers then exited the apartment and obtained a search warrant before conducting a more thorough search.

The district court denied the defendant's motion to suppress and the Eighth Circuit Court of Appeals affirmed, concluding that "the circumstances giving rise to exigency are clear." *Id.* at 816. The Court noted that shotgun blasts were heard coming from the apartment, some pellets landed across the street, the apparent tenant of the apartment denied responsibility, and another part-time occupant of the apartment "refused to shed any light on the situation." *Id.*

> Viewing the circumstances objectively, these facts create clear justification for a reasonable law-enforcement officer to enter the apartment without a warrant to secure the shotgun and to discern if the shooter or any victims in need of medical attention remained inside.

*Valencia*, 499 F.3d at 816.

Turning to the facts in the instant action, officers were called to the scene on a report of a "domestic disturbance." Shortly after arriving on the scene, officers were further advised that at least one shot was fired in that location just moments before their arrival. Officers confirmed that gunshot projectiles had penetrated a nearby residence. According to Sergeant Phipps, he could not tell how many shots had been fired or from what type of gun. Sergeant Phipps believed that the damage could have been the result of several shots by a small caliber gun, or could have been caused by a shotgun.

7

The occupant of the damaged residence told officers that she heard a single gunshot. At the time of hearing, however, Sergeant Phipps testified that witnesses are sometimes mistaken regarding the actual number of gunshots. For example, a witness may focus on a gunshot which accompanied damage to her house and not hear other gunshots. In the heat of the moment, a witness may also mishear or misremember the number of gunshots. Sergeant Phipps also opined that echoes or other factors may impact the accuracy of a witness' recollection regarding the number of gunshots. Accordingly, Sergeant Phipps testified that he did not simply accept as a fact that only one gunshot was fired.

Officers were also told that a woman who lived in the house across the street was involved in the disturbance and had left in a vehicle just before the officers arrived. Under these circumstances, it was natural for the officers to focus their attention on the house located across from the damaged house. As the officers approached Defendant's house, they found the back door "ajar" and the lights on inside the house. Sergeant Phipps announced his presence as a police officer on several occasions, but received no response.

At that point, officers knew that at least one shot had been fired just moments before their arrival, causing damage to the house across the street. A woman living in Defendant's house was involved in the disturbance which brought officers to the area, but had left in a vehicle before the officers arrived. The back door to the house was open and the lights were on. Repeated efforts to draw the attention of anyone within the house were unsuccessful. Under these circumstances, a reasonable law enforcement officer could conclude that the shooter may be inside the house at 1415 Hollywood Drive, or there may be a victim or hostage found within the house. Accordingly, a warrantless entry into the house was reasonable. *United States v. Janis*, 387 F.3d 682, 687 (8th Cir. 2004) (a legitimate concern for the safety of individuals may constitute "exigent circumstances" justifying a warrantless entry). The "touchstone" of the Fourth Amendment is "reasonableness." *Brigham City*, 547 U.S. at 403. Concerns for officer safety, as well as the safety of any persons within the house, support a finding that it was reasonable to enter the house without waiting for the issuance of a search warrant.

In order to effect a safe search, Sergeant Phipps called for the special response team. While waiting for the team to arrive, officers found an empty shotgun shell casing near the foundation of the residence. This provided further support for an objective officer to believe the shooter may be located within the house. *Id.* at 404 ("An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed objectively, justify the action."). A search of the residence after the special response team arrived, however, did not reveal any persons or contraband in plain view.

Officers then directed their attention to the nearby detached garage. For the same reasons that exigent circumstances existed for a warrantless entry into the house, exigent circumstances also justified a warrantless entry into the garage. Officers knew that a shooting had occurred only moments before their arrival. Neither the shooter nor the weapon had been located. A legitimate concern for officer safety, as well as the potential for finding victims or hostages, justified a search of the garage. *Poe*, 462 F.3d at 1000.

The Court does not believe that it is of constitutional significance that Defendant was not located in the initial protective sweep, but instead was discovered after a short delay. The initial "fluid" search of the garage--lasting less than a minute--was to determine whether there were any persons constituting an immediate danger to officers. While no potential shooters or victims were found in the first sweep, the potential for persons hiding and constituting an ongoing risk to officers remained. Indeed, within a short period of time, Defendant was found hiding under garbage bags. Even after Defendant was located and removed from the garage, the potential for one or more additional hiding persons remained. That is, a shooter could have been located in the overhead "attic area" where the shotgun was found.

### 2. *Destruction of Evidence Exception*

The Government also argues that the warrantless search was justified to prevent the destruction of evidence. Since exigent circumstances were established by a legitimate concern for officer safety and the safety of others, it is not necessary for the Court to

consider this additional argument. The Court notes parenthetically, however, that it believes the Government's argument is not well-founded.

According to the Government's argument, there was "a fair probability that evidence or contraband would be found in the garage," and "[h]ad officers waited to get a search warrant, this evidence could have been destroyed."[4] "The risk that evidence will be destroyed during the time required to obtain a search warrant can be an exigent circumstance that justifies a warrantless entry." *United States v. Leveringston*, 397 F.3d 1112, 1116 (8th Cir. 2005). In this case, however, the Government has not met its burden of showing that evidence was about to be destroyed. *Vale v. Louisiana*, 399 U.S. 30, 35 (1970).

The Government has not pointed to any evidence which would support an objective belief that the destruction of evidence was imminent. To support a finding of exigent circumstances, the officer must have some information to support a reasonable belief that evidence may be destroyed. *See, e.g., Leveringston*, 397 F.3d at 1116 (upon hearing water flowing and a garbage disposal running, officers responding to a report of suspected drug activity "reasonably could infer that these sounds indicated the destruction of evidence of drug trafficking in response to the presence of police."); *United States v. Knobeloch*, 746 F.2d 1366 (8th Cir. 1984) (persons heard "scurrying" inside a motel room suggested drugs were about to be destroyed); *Thomas v. Parett*, 524 F.2d 779 (8th Cir. 1975) (sounds heard through an apartment wall suggested that the subjects were leaving the apartment with drugs).

The cases cited by the Government in support of its argument are easily distinguished. In *United States v. Jansen*, 470 F.3d 762, 765 (8th Cir. 2006), the officer "saw evidence of drug use in the trailer and reasonably concluded that he needed to secure the trailer before leaving to get a warrant to make sure no one else was present and to

---

[4] *See* Government's Resistance to Defendant's Motion to Suppress (docket number 18) at 6.

prevent destruction of the drug evidence." In the instant action, the officers were unaware of any contraband located in the garage and (but for the risk to public safety) could have secured the exterior of the building while securing a search warrant. In *Kleinholz v. United States*, 339 F.3d 674, 677 (8th Cir. 2003), the Court concluded that the smell of ether, associated with the manufacture of methamphetamine, provided exigent circumstances justifying "an immediate but limited search." The officers here did not have any direct evidence that the garage contained contraband.

## B. Consent Search of the House

After Defendant was removed from the garage, but before he was transported to the police station, he gave officers consent to search his residence. Consent is a valid exception to the warrant requirement. *United States v. Guzman*, 507 F.3d 681, 687 (8th Cir. 2007). Defendant admits that he consented to a search of his residence. Furthermore, Defendant does not argue that his consent was given involuntarily. Rather, Defendant argues that "[i]f not for the illegal search of the garage the Defendant would not have been found and seized, and consent to search the residence would not have been obtained from him."[5] Accordingly, Defendant argues that the evidence seized from the house as a result of the consent search is "fruit of the poisonous tree" and should be suppressed.

In the landmark case of *Wong Sun v. United States*, 371 U.S. 471 (1963), the Court concluded that evidence obtained by "exploitation" of illegal actions by the police is "fruit of the poisonous tree" and subject to the exclusionary rule.

> We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."

---

[5] *See* Brief in Support of Motion to Suppress (docket number 15-2) at 5-6.

*Id.* at 487-488.

As set forth above, however, the Court has concluded that the warrantless search of Defendant's garage was not violative of the Fourth Amendment and, therefore, a "fruit of the poisonous tree" analysis is unnecessary.

### C. Defendant's Statements to the Police

Next, Defendant argues that his statements to the police should be suppressed "because they were a product of the illegal search of his garage." While Defendant's motion and supporting brief are somewhat imprecise, Defendant's argument is apparently the same as that advanced regarding the search of his residence--that is, Defendant would not have been found and would not have made any statements to the police if officers had not conducted an illegal search of the garage. Defendant does not challenge the factual allegations that (1) his *Miranda* rights were given at the scene and again at the police station, (2) he indicated on both occasions that he understood his rights, and (3) he then voluntarily responded to police questioning.

The Government argues that even if officers illegally entered the garage without a warrant, Defendant's statements are nonetheless admissible pursuant to *New York v. Harris*, 495 U.S. 14 (1990). There, officers had probable cause to arrest Harris and went to his apartment to take him into custody. The officers did not first obtain an arrest warrant and Harris did not consent to the police officers' entry into his home. Entering Harris' home to arrest him without a warrant violated the Fourth Amendment. *Id.* at 17 (citing *Payton v. New York*, 445 U.S. 573 (1980)).

While entry into Harris' home violated his constitutional rights, the Court nonetheless concluded that Harris' subsequent post-*Miranda* statement given at the police station need not be suppressed. The holding in *Payton* was designed to "protect the physical integrity of the home," it was not intended to provide criminal suspects "protection for statements made outside their premises where the police have probable cause to arrest the suspect for committing a crime." *Id.*

> Nothing in the reasoning of that case [referencing *Payton*] suggests that an arrest in a home without a warrant but with probable cause somehow renders unlawful continued custody of the suspect once he is removed from the house. There could be no valid claim here that Harris was immune from prosecution because his person was the fruit of an illegal arrest.

*Id.* at 18. In concluding that Harris' statement at the police statement was admissible, the Court noted that "the police had a justification to question Harris prior to his arrest; therefore, his subsequent statement was not an exploitation of the illegal entry into Harris' home." *Id.* at 19.

Defendant argues, on the other hand, that this case is governed by the Court's holding in *Brown v. Illinois*, 422 U.S. 590 (1975). In that case, Brown was arrested without probable cause and without a warrant. Brown contested the admissibility of his post-*Miranda* statement. Citing *Wong Sun*, the Court concluded that the statement must be "sufficiently an act of free will to purge the primary taint." *Id.* at 602. While the administration of a *Miranda* warning is a factor to be considered, it "cannot assure in every case that the Fourth Amendment violation has not been unduly exploited." *Id.* at 603. Brown gave his first statement less than two hours after his illegal arrest without any "intervening event of significance." *Id.* at 604. Brown's second statement "was clearly the result and the fruit of the first." *Id.* at 605. The Court concluded that the state court was "in error in assuming that the *Miranda* warnings, by themselves, under *Wong Sun* always purged the taint of an illegal arrest." *Id.*

Again, however, it is unnecessary for the Court in the instant action to resolve this dispute. As set forth in Part V.A. above, the Government has met its burden of proving a legitimate concern for public safety, thereby constituting exigent circumstances justifying a warrantless entry. Therefore, the Court need not determine whether Bradford's subsequent statements are tainted (notwithstanding the *Miranda* warnings) by an unconstitutional entry into the garage.

## VI. RECOMMENDATION

For the reasons set forth above, I respectfully recommend that the district court **DENY** the Motion to Suppress (docket number 15) filed by the Defendant on July 22, 2008.

The parties are advised, pursuant to 28 U.S.C. § 636(b)(1)(B), that within ten (10) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *Defendant is reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections." Accordingly, if Defendant is going to object to this Report and Recommendation, he must promptly order a transcript of the hearing held on August 5, 2008.*

DATED this 12th day of August, 2008.

_____
JON STUART SCOLES
United States Magistrate Judge
NORTHERN DISTRICT OF IOWA